STATE of Indiana, Indiana Real Estate Commission, Appellants–Respondents,

v.

C.M.B. III ENTERPRISES, INC., C.M. Bottema/Candice McKinney, Appellees–Petitioners.

No. 32A01–9906–CV–182.

Court of Appeals of Indiana.

Aug. 30, 2000.

Jeffrey A. Modisett, Attorney General of Indiana, Rosemary L. Borek, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellants.

E. Scott Treadway, Eric M. Hylton, Lowe Gray Steele & Darko, LLP, Indianapolis, Indiana, Attorneys for Appellees.

## OPINION

MATTINGLY, Judge

An administrative law judge panel issued and the Indiana Real Estate Commission adopted a final order that imposed disciplinary sanctions on C.M.B. III Enterprises, Inc., C.M. Bottema, and Candice McKinney (collectively, "the brokers"). The brokers petitioned for judicial review and the trial court set aside the final order. The State of Indiana and the Commission now appeal, asking us to decide whether the trial court erred in setting aside the Commission's final order. The Commission raises two issues that we restate as:

1. Whether the Commission's factual findings were supported by substantial evidence, and

2. Whether the Commission properly ordered McKinney to refund, as a sanction for her actions in connection with her principal's purchase of a home, the commission she received.

We affirm in part, reverse in part, and remand to the Commission for further proceedings.

## FACTS AND PROCEDURAL HISTORY

At the time of the events relevant to this appeal, C.M.B. III Enterprises, Inc. was an Indiana corporation doing business as ReMax Excel, Realtors ("ReMax"); Bottema was the owner of ReMax and principal

broker; and McKinney was a broker-salesperson licensed by the State and associated with ReMax and Bottema.

Charles and Laura Roberts were looking for a new home. On August 7, 1995, McKinney and the Robertses signed a form entitled "Buyer Understanding and Agency Selection," which indicated that the Robertses had chosen McKinney as their "buyer agent." On August 9, 1995, McKinney and the Robertses signed a listing agreement that gave McKinney the exclusive right to sell the Robertses' home. The listing agreement was to run from August 9, 1995 to January 9, 1996.

In September of 1995, Charles Roberts asked McKinney to withdraw the Robertses' home from the market. McKinney stopped actively marketing the home, and the parties did not have contact again until December of 1995. At that time, Laura Roberts told McKinney that the Robertses were considering building a house west of Danville. McKinney apparently told the Robertses that they might not like that area and suggested that they visit developments south of U.S. 36 and adjacent to County Road 625.

On December 10, 1995, the Robertses visited a neighborhood that McKinney had recommended to them. Finding that they did not like that neighborhood, they left and then stopped at a development where they met Carlotta Warner of Ashley Homes. The Robertses saw a floor plan they liked and decided to purchase a house built by Ashley Homes. On December 11, 1995, the Robertses asked McKinney to place their home back on the market for sale. On December 13, 1995, McKinney and the Robertses signed another listing agreement for the Robertses' home, which agreement was to run from December 13, 1995 to May 13, 1996.

McKinney visited Ashley Homes and asked Warner whether the Robertses had indicated to Ashley Homes that McKinney was their realtor. Warner informed McKinney that McKinney was not designated as the Robertses' realtor in the Ash-

ley Homes paperwork regarding the new home purchase. McKinney indicated to Warner that McKinney had referred the Robertses to Ashley Homes. Warner then added McKinney's name on the Ashley Homes purchase contract, designating McKinney as the Robertses' realtor.

The Robertses sold their home and purchased the new home they had arranged to build with Ashley Homes. The brokers received a commission of $5,060.00 for the sale of the Roberts' home, and a second commission of $4,645.65 for the sale of the Ashley Home.

On February 5, 1997, the State filed a complaint with the Commission which alleged, among other things, that the Brokers engaged in "the incompetent practice of real estate" (R. at 101). An administrative law judge panel of the Commission held a hearing and issued the following order:

### FINDINGS OF FACT

. . . .

4. On or around December 13, 1995, Charles and Laura Roberts ("Customers") listed real property known as 180 N C.R. 450 E, Danville, Indiana, with ReMax.

5. McKinney acted as salesperson/agent and signed the listing contract as such on behalf of ReMax.

6. On or around December 11, 1995, prior to signing the listing agreement with ReMax, Customers signed a contract to build a new home with Ashley Homes, Inc. ("Ashley Homes"). Ashley Homes is an Indiana corporation engaged in the business of building new homes.

7. The purchase price for the new home was $154,399.00. Customers did not obtain the services of any real estate broker to negotiate the transaction with Ashley Homes. Accordingly, the contract specifically noted that Realtor is "not applicable."

8. Without the knowledge and consent of Customers, McKinney told a representative of Ashley Homes that she represented Customers in connection with the purchase of their home. McKinney indicated that ReMax was entitled to a commission from the transaction. McKinney caused her name to be included in the contract between Customers and Ashley Homes.

9. Customers denied McKinney's claim that she represented them and immediately rejected McKinney's real estate services in connection with the Ashley Homes transaction.

10. McKinney insisted to the representative of Ashley Homes that ReMax was entitled to a 3% commission. The Ashley Homes purchase was contingent on the sale of Customers' property listed with ReMax. McKinney's name was added to the Customers' purchase agreement involving the new home because Ashley Homes wanted to avoid negative publicity.

11. Without performing any real estate services in the transaction involving Customers' new home, ReMax received a commission of $4,645.65.

12. ReMax also received a commission in the amount $5,060.00 for their original listing contract with Customers for the sale of their previous home.

## CONCLUSIONS OF LAW

1. McKinney engaged in material misrepresentation by indicating to Ashley Homes that she represented Customers for the purpose of obtaining a commission in connection with the purchase of the new home without the knowledge and consent of Customers.

2. McKinney engaged in material deception by misrepresenting her contractual status to Ashley Homes for the purpose of obtaining a commission in connection with Customers' purchase of their new home.

3. ReMax, McKinney and Bottema ("Respondents") received an undisclosed direct profit in conjunction with the Ashley Homes transaction. The Panel determined that Customers did not find out about the actual payment of a commission to Respondents until the Ashley Homes transaction closed on June 3, 1996.

4. Respondents engaged in the incompetent practice of real estate.

. . . .

6. ReMax and Bottema are responsible to the Commission for the actions of their associated licensee.

. . . .

10. These violations of the Indiana real estate statutes and rules are grounds for disciplinary action by the commission. . . .

11. Indiana Code 25–11–1–12 [sic] gives the Commission the authority to impose various sanctions, either singly or in combination, when it finds a practitioner in violation.

## ORDER

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that:

. . . .

1. [McKinney's] real estate license number . . . shall be placed on probation INDEFINITELY and [McKinney] shall be required to:

a. Refund $4,645.65 to Ashley Homes within three (3) months following issuance of the Final Order. This amount represents the unearned commission received by [McKinney] in connection with the Ashley Homes transaction;

. . . .

(R. at 19–23.) The Commission adopted this order as its final order.

On August 7, 1998, the brokers petitioned for judicial review of the Commission's final order. After a hearing on this petition, the trial court set aside the Com-

mission's final order as unsupported by substantial evidence and in excess of statutory authority. Specifically, it determined the administrative record did not support 1) the Commission's conclusion that McKinney made material misrepresentations; 2) the Commission's conclusion that the brokers received an "undisclosed profit"; and 3) the Commission's conclusion that McKinney had engaged in fraud or deception. It further determined the Commission exceeded its authority in ordering as a sanction that McKinney return the commission she received from the Ashley Homes transaction. The trial court set aside the Commission's final order and remanded the case to the Commission for further proceedings. The State and the Commission now appeal.

## STANDARD OF REVIEW

Judicial review of an administrative decision is limited. *Indiana Dep't of Envtl. Management v. Adapto, Inc.*, 717 N.E.2d 646, 649 (Ind.Ct.App.1999). Review of an agency's decision is confined largely to the agency record. *Id.* The court cannot reweigh the evidence and must review the record in the light most favorable to the administrative proceedings. *Hanley v. Eastern Ind. Inv. Corp.*, 706 N.E.2d 576, 578 (Ind.Ct.App.1999), *transfer denied*, 726 N.E.2d 314 (Ind.1999). The court may neither try the case *de novo* nor substitute its judgment for that of the agency. *Adapto*, 717 N.E.2d at 649. The reviewing court is to give deference to the expertise of the administrative body. *Id.* The decision should be reversed only when it is (1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) contrary to a constitutional right, power, privilege, or

immunity; (3) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (4) without observance of procedure required by law; or (5) unsupported by substantial evidence. *Id.*

## DISCUSSION AND DECISION

### 1. Substantial Evidence

The trial court held that the Commission's final order was unsupported by substantial evidence. As part of that decision, the trial court rejected the final order's first four conclusions of law. We begin our analysis by examining these conclusions, inasmuch as they appear to contain the fundamental legal theories upon which the Commission relied as grounds for imposing disciplinary sanctions. These legal theories are (1) misrepresentation, (2) deception, (3) receipt of an undisclosed direct profit, and (4) the incompetent practice of real estate.[1]

Substantial evidence is relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *City of Indianapolis v. Woods*, 703 N.E.2d 1087, 1091 (Ind.Ct.App.1998), *transfer denied*, 714 N.E.2d 174 (Ind.1999). We find there was substantial evidence to support the Commission's conclusion that McKinney engaged in material misrepresentation but that there was not substantial evidence to support its conclusion that McKinney was engaged in deception or that she received an undisclosed direct profit.

### a. Misrepresentation

According to the Commission's final order, McKinney's misrepresentation was her suggestion to Ashley Homes that

---

1. Our analysis specifically addresses only the first three legal theories, inasmuch as the fourth is inclusive of, and not different from, the first three. These legal theories appear to be derived from Ind. Admin. Code tit. 876, r. 1-1-40, which the Commission cites in its final order. That rule states in part:

> Incompetent practice of real estate includes the following:

> . . . .

> (3) Receiving, accepting, or giving an undisclosed direct profit on expenditures made in conjunction with a real estate transaction.

> . . . .

> (14) Committing any act of fraud or misrepresentation while engaged in acts that, by law, require a license.

she represented the Robertses in their purchase of the new home. In our view, there is substantial evidence to support a conclusion that McKinney misrepresented her status.

As we are aware of no Indiana decisions defining "misrepresentation" within the context of the rule relied on by the Commission, we begin our analysis by determining the term's meaning. Although this term appears in an administrative rule, we interpret it in view of principles applicable to the construction of statutes. See *Indiana Dep't of Public Welfare v. Payne*, 622 N.E.2d 461, 465 (Ind.1993) ("In interpreting an administrative regulation, the rules applicable to construction of a statute apply to construction of the regulation."). The cardinal rule of statutory construction is to ascertain the intent of the drafter by giving effect to the plain and ordinary meaning of the language used. *T.W. Thom Constr., Inc. v. City of Jeffersonville*, 721 N.E.2d 319, 324 (Ind.Ct.App.1999).

Misrepresentation ordinarily means "[a]ny manifestation by words or other conduct by one person to another that, under the circumstances, amounts to an assertion not in accordance with the facts." *Black's Law Dictionary* 1001 (6th ed.1990). McKinney acted as a broker for the Robertses in the transaction involving the sale of their existing home, and it would not have been a misrepresentation for McKinney to declare that she represented the Robertses in that transaction. But in the transaction involving the Robertses' purchase of the new home, the evidence was in conflict as to whether McKinney was acting as a buyer's agent for the Robertses.

At the hearing before the Commission, McKinney gave testimony suggesting that, in the new home purchase, she was actively assisting the Robertses as a broker. Specifically, her testimony indicates (1) she scheduled an appointment for her and the Robertses to visit the development at which the Robertses later decided to purchase a home, and (2) the Robertses had become acquainted with that development as a direct result of information that McKinney gave them. Charles Roberts testified that McKinney did not play the role of broker in the Ashley Homes transaction. His testimony suggests that the Robertses visited a neighborhood that McKinney told them about, but ultimately purchased a home in a development to which McKinney did not specifically direct them, that is, the Ashley Homes development.

The Commission resolved this conflict against McKinney. It found "Customers did not obtain the services of any real estate broker to negotiate the transaction with Ashley Homes," (R. at 20), and Re-Max received a $4,645.65 commission "[w]ithout performing any real estate services in the transaction involving Customers' new home[.]" *Id.* We cannot say that these findings are without evidentiary support. Moreover, in view of these findings, the Commission could properly conclude that McKinney engaged in misrepresentation. Any suggestion that McKinney represented the Robertses in the new home purchase was inconsistent with the findings that the Robertses did not retain her services to negotiate that transaction, and that she did not perform any real estate services in that transaction. Accordingly, substantial evidence supports the Commission's conclusion that McKinney engaged in material misrepresentation.[2]

**2.** We note that on August 7, 1995, before the new home purchase, McKinney and the Robertses signed a form entitled "Buyer Understanding and Agency Selection." (R. at 360.) This form indicates that the Robertses had chosen McKinney as their "buyer agent" who would represent their interests as buyers. *Id.* The form further indicates the Robertses were

"authorizing [McKinney] to be compensated from the sales transaction by accepting a percentage of the commission received by the listing agent." *Id.* This form indicates that the Robertses desired to work with McKinney while attempting to purchase real estate. However, this form does not address whether McKinney was to act as the Robertses' broker

### b. *Deception*

■■ The Commission's conclusion that McKinney engaged in deception is apparently derived from Ind.Code § 25-1-11-5(a), which is cited in the Commission's final order. That section states in part:

A practitioner is subject to the exercise of the disciplinary sanctions under section 12 of this chapter if, after a hearing, [the Commission] finds that:

(1) a practitioner has:

. . . .

(B) engaged in fraud or material deception in the course of professional services or activities[.]

As we find no decisions giving meaning to the term "deception" within the context of this statute, we must interpret the term, effectuating its plain and ordinary meaning. *T.W. Thom Constr., Inc.*, 721 N.E.2d at 324. Deception ordinarily means "intentional misleading by falsehood spoken or acted." *Black's Law Dictionary, supra,* at 406. According to the Commission's final order, McKinney's deception was her misrepresentation to Ashley Homes regarding her contractual status with the Robertses.

While there was substantial evidence that McKinney engaged in misrepresentation by suggesting to Ashley homes that she represented the Robertses, this misrepresentation does not rise to the level of deception. Deception requires a representation that is intentional, and the record does not support the conclusion that McKinney intended to mislead, or make misrepresentations to, Ashley Homes. Accordingly, the Commission's conclusion that McKinney engaged in material deception is not supported by substantial evidence.

in the new home purchase that was concluded with Ashley Homes, nor does it clearly indicate that the Robertses were obliged not to purchase real estate without McKinney's

### c. *Receipt of an Undisclosed Direct Profit*

■■ The Commission's conclusion that the brokers "received an undisclosed direct profit," (R. at 21), is not supported by substantial evidence. Receipt of an "undisclosed direct profit" is an act that may constitute "incompetent practice of real estate" under Ind. Admin. Code tit. 876, r. 1-1-40(3). The Commission apparently found such a "profit" in the form of the payment to the brokers of a commission in the transaction with Ashley Homes, and the administrative law judge panel apparently determined the profit was "undisclosed" because the Robertses "did not find out about the actual payment of a commission to [the brokers] until the Ashley Homes transaction closed. . . ." (R. at 21.) However, we find that the commission the brokers received in connection with the Ashley Homes transaction is not the type of "profit" contemplated by that section of the Commission's rules and the receipt of the sales commission thus cannot serve as a basis for a finding the brokers incompetently practiced real estate.

■■ The parties direct us to no Indiana decisions that have interpreted the phrase "undisclosed direct profit" within the context of Ind. Admin. Code tit. 876, r. 1-1-40, and we therefore seek to determine its meaning. The Commission characterizes the phrase as a "term of art related to real estate practice," (Br. of the Appellants at 19), and argues the trial court was thus obliged to defer to the Commission's interpretation of the term. We acknowledge the principle that an interpretation given administrative rules and regulations by an agency charged with the duty of enforcing those rules or regulations is entitled to great weight. *See Partlow v. Indiana Family and Soc. Servs. Admin.,* 717 N.E.2d 1212, 1214 (Ind.Ct.

assistance. As such, the form does not preclude a finding that McKinney did not represent the Robertses in the new home purchase.

App.1999). However, courts, rather than administrative agencies, must resolve questions of statutory construction, *Indiana Civil Rights Comm'n v. Alder*, 714 N.E.2d 632, 636 (Ind.1999), and our deference to agency interpretation is limited to construction that is "reasonable." *Heritage House of Salem, Inc. v. Bailey*, 652 N.E.2d 69, 77 (Ind.Ct.App.1995).

The Commission's interpretation of an "undisclosed direct profit" to include a commission which a broker receives in a real estate transaction but payment of which the broker's client does not discover until the transaction closes is not, in our view, a reasonable one. The rule upon which the Commission apparently relies does not, by its own terms, prohibit any "undisclosed direct profit." Rather, it prohibits "[r]eceiving, accepting, or giving an undisclosed direct profit *on expenditures made in connection with* a real estate transaction." The Commission directs us to no record evidence of "expenditures" McKinney made in connection with this transaction and from which she received profits she did not disclose.

■ We decline to hold that receipt of an undisclosed commission constitutes "incompetent practice of real estate" under Ind. Admin. Code tit. 876, r. 1–1–40(3) absent evidence of an "expenditure" made in conjunction with a real estate transaction. Accordingly, we find to be unsupported by substantial evidence the Commission's conclusion that the brokers received an undisclosed profit in the form of McKinney's commission.

2. *Authority to Order Refund of $4,645.65*

■ The trial court correctly held that the Commission exceeded its statutory authority when it ordered McKinney to refund $4,645.65 to Ashley Homes.

The Commission would find authority to order the refund under Indiana Code § 25–1–11–12(a)(5)(D), which lists the disciplinary sanctions a board may impose on

licensees of certain regulated professions, which includes real estate. The Commission appears to argue that the refund order was in the nature of restitution and asserts that this subsection permits the Commission to order restitution. It does not.

Ind.Code § 25–1–11–12 states in pertinent part:

(a) [The Commission] may impose any of the following sanctions, singly or in combination, if [the Commission] finds that a practitioner is subject to disciplinary sanctions under sections 5 through 9 of this chapter:

(1) Permanently revoke a practitioner's license.

(2) Suspend a practitioner's license.

(3) Censure a practitioner.

(4) Issue a letter of reprimand.

(5) Place a practitioner on probation status and require the practitioner to:

(A) report regularly to [the Commission] upon the matters that are the basis of probation;

(B) limit practice to those areas prescribed by [the Commission];

(C) continue or renew professional education approved by [the Commission] until a satisfactory degree of skill has been attained in those areas that are the basis of the probation; or

(D) perform or refrain from performing any acts, including community service without compensation, that [the Commission] considers appropriate to the public interest or to the rehabilitation or treatment of the practitioner.

(6) Assess a civil penalty against the practitioner for not more than one thousand dollars ($1,000) for each violation listed in sections 5 through 9 of this chapter except for a finding of incompetency due to a physical or mental disability.

Ordering a refund of $4,645.65 in this case exceeded the authority provided by subsection (a)(5)(D). We note initially that nothing in the language of subsection (a)(5)(D) states that the power to order restitution to an individual buyer or seller[3] is within the authority of the Commission. The only monetary sanction the statute explicitly permits is a civil penalty of no more than $1,000.

It is well established that "[l]aws which are punitive in nature, and which would deprive an individual of the freedom to exercise the skills of his business or profession, should be construed against the denial of this freedom. Before the police power of the state is used to prohibit the conduct of an individual as 'unprofessional', it should be explicitly so defined as such conduct, or it should fall clearly within the scope of the act." *Cassidy v. Indiana State Bd. of Registration and Examination in Optometry*, 244 Ind. 137, 149, 191 N.E.2d 492, 498 (1963).

Other than the limited civil penalties authorized by section 12(a)(6), the only sanctions authorized by the statute are revocation or suspension of a professional license; censure or reprimand; and placement of the licensee on probation with conditions which might include reporting to the Commission, obtaining professional education, limiting practice, or "performing any acts . . . the [Commission] considers appropriate. . . ." Where words of specific and limited signification in a statute are followed by general words of more comprehensive import, the general words are to be construed as including only those things as are of like kind or class to those designated by the specific words, unless a contrary intention is clearly shown in the statute. *Consolidated Rail Corp. v. Lewellen*, 682 N.E.2d 779, 784 (Ind.1997).

The listed sanctions other than civil penalties contemplate reprimand, license re-

striction or revocation, and probation—all non-monetary sanctions. We thus construe the general language in section (a)(5) to be limited to sanctions of that same class and must decline to adopt the Commission's construction under which the Commission could presumably impose financial penalties far in excess of the largest civil penalty authorized by the statute. The order that the brokers return McKinney's commission on the Ashley Homes transaction exceeded the Commission's statutory authority.

## CONCLUSION

The trial court erred to the extent it determined there was not substantial evidence to support the Commission's conclusion McKinney engaged in misrepresentation. The trial court correctly determined there was not substantial evidence to support the Commission's conclusions that McKinney engaged in deception and that the brokers received an undisclosed direct profit, and it correctly found the Commission lacked authority to order the brokers to return the commission on the Ashley Homes transaction. We thus affirm in part, reverse in part, and remand to the Commission for further proceedings consistent with this opinion.

RILEY, J., and BAILEY, J., concur.

---

**3.** Subsection (5)(D) was amended effective July 1, 2000 to provide that a commission may order *"community restitution* or service

without compensation." (Emphasis supplied.)